# Federal Defenders
## OF NEW YORK, INC.

Eastern District
16 Court Street-3rd Floor, Brooklyn, NY 11241
Tel: (718) 330-1200 Fax: (718) 855-0760

Leonard F. Joy
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

July 12, 2006

The Honorable Edward R. Korman
Chief U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

By Fax and Hand Delivery

Re: U.S.A. v. Noureddine Malki, 06-CR-216 (ERK)

Your Honor:

Please accept this letter brief in lieu of a memorandum of law in support of Mr. Malki's motion to suppress physical evidence taken from his apartment. I apologize for the delay in sending this brief, but there was a delay in the defense receipt of the minutes from the hearing.

The issues raised in this case are first, did Vincent Alston have permission to consent to a search of Mr. Malki's apartment? The answer to that question is no. Mr. Alston did not have common authority over Mr. Malki's apartment, he did not have any interest in Mr. Malki's apartment, and the only permission he had to gain access to the apartment would be permission granted by Mr. Malki. Mr. Alston had no other legal permission or authority to enter the apartment. As a result, any written or oral consent to search the apartment from Mr. Alston to the agents is irrelevant. He simply did not have the authority to give consent.

The second issue raised in this case, then, is did the agents have the right to rely on Mr. Alston's claim that Malki had given authority for a search of entire apartment without further inquiry? The answer to that question is also no. Mr. Alston's claim that Mr. Malki had told him that the agents could "take whatever they wanted" from the apartment was an extraordinary expansion of the consent to search that Mr. Malki had given to the government's own agent and was an extraordinary expansion of the intrusion into Mr. Malki's privacy rights. The fact that Mr. Alston was a friend of Mr. Malki's, handling Mr. Malki's rent and his telephone bills in his absence, is not a sufficient show of apparent authority to warrant the government's reliance on his claim of Mr. Malki's expansion of the search. The government was required to make further inquiry, given the extraordinarily limited scope of consent the government had directly from Mr. Malki. This is especially true given that there was no issue of exigency to the search, and the government easily could have retrieved laptop and hard drive on the day in question and waited to confirm the expansion of the search with Mr. Malki at a later date.

## I. History.

Mr. Malki was hired by Titan Corporation to work as an Arabic interpreter with various U.S. Military units stationed in Iraq from 2003 until 2005. On or about September 29, 2005, while in Iraq, Mr. Malki was visited by an agent of the FBI and asked for permission to search his cell phone, laptop computer and a hard drive. Mr. Malki was asked to provide a written consent to search these items and he did so. The laptop and hard drive were located in Mr. Malki's apartment in Brooklyn, and on September 30, 2005, an investigator from the U.S. Attorney's office and other government agents conducted a search of the apartment and took items beyond the laptop computer and the hard drive. The government now seeks to introduce these items into evidence at the trial of Mr. Malki.

## II. Hearing testimony.

Three witnesses were called by the government at the hearing held on June 16, 2006. The first witness, investigator John Ross, testified on direct examination that he was investigating Mr. Malki because of inconsistencies in information provided by Mr. Malki as part of his security clearance. As a result, Mr. Ross testified that he wanted to obtain Mr. Malki's consent to search his laptop computer and hard drive, located in Brooklyn, NY. T at page 11, lines 7-15.[1] Mr. Ross testified that an agent, Otto Voettiner, spoke to Mr. Malki in Iraq and obtained his verbal and written consents to search the laptop computer and hard drive. T at 13, 6-19. Mr. Ross also testified that Mr. Malki had arranged for Mr. Vincent Alston to open the door and permit the agents entry to the apartment in Brooklyn to take the laptop computer and hard drive. T at 13, 20-24. Mr. Ross testified that he understood Mr. Alston to be a close friend of Mr. Malki's upon whom Mr. Malki relied to take care of his apartment and some of his bills while he was overseas. T at p.13, 25- p.14, 4.

Mr. Ross testified that on September 30, he met Mr. Alston at Mr. Malki's apartment in Brooklyn and that Mr. Alston said that Mr. Malki had told Mr. Alston to let the agents into the apartment and that they could take whatever they wanted in addition to the laptop computer and hard drive. T at p.14, 7-18, p.18, 3-20. Mr. Ross testified that he also had Mr. Alston sign a "consent to search" form to search the apartment. T at p.14, 19-p.15, 22.

On cross-examination Mr. Ross testified that he had insisted on obtaining a written consent form from Mr. Malki to search the lap top computer and hard drive, and that he understood the contents of the written consent, even though he did not receive it prior to the search of Mr. Malki's apartment. T at p.21, 1-11; p.22, 4-8. Mr. Ross further testified that he learned that Mr. Alston did not have the keys to Mr. Malki's apartment and that Mr. Alston had to obtain the keys from another individual. T at 23, 4-9. Mr. Ross testified that after being told

---

[1] "T" refers to the transcript of the hearing that took place on June 16, 2006. In the hearing, Mr. Malki is referred to as both Mr. Malki and "Mr. Nour." We will refer to Mr. Malki as Mr. Malki in this letter brief.

by Mr. Alston that Mr. Malki had told Mr. Alston to tell the agents that they could take any other items they needed to take, Mr. Ross made no effort to contact Mr. Malki or Agent Voettiner to confirm this information.  T at p.24, 25-p.25, 17.

Mr. Ross testified that from a prior conversation with Mr. Alston, Mr. Ross considered him the custodian of the apartment because Mr. Alston had told Mr. Ross that he paid the rent, paid Mr. Malki's telephone bill, and took care of other administrative issues for Mr. Malki.  T at 26, 3-16; p.27, 25-p.28, 6.

The second witness, Agent Otto Voettiner, testified on cross-examination that he had asked Mr. Malki for permission to search his laptop computer and hard drive.  T at p.42, 23-p.43, 4.  He further testified that Mr. Ross asked him to obtain written consent to search these items when Agent Voettiner reported to Mr. Ross that he had obtained verbal consent.  T at p.43, 17-p.44, 1.  Agent Voettiner testified that he was present when Mr. Malki called Mr. Alston, and that Mr. Malki had to instruct Mr. Alston as to where to obtain the keys to the apartment.  T at p.44, 19-p.45, 6.  Agent Voettiner also testified that he only heard Mr. Malki give Mr. Alston permission to give the laptop computer and hard drive to the agents.  T at 45, 15-25.

The final witness at the hearing was Mr. Vincent Alston.  Mr. Alston testified on direct examination that he had been asked to pay Mr. Malki's rent and telephone bill while he was away in Iraq, but that he had not been given the keys to Mr. Malki's apartment.  T at 51, 11-25.  Mr. Alston testified that he recalled receiving two calls from Mr. Malki about the agents taking his laptop computer and hard drive, but that he did not recall Mr. Malki saying, or himself telling, the agents that they could take anything they wanted from the apartment.  T at p.54, 12-p.55,8; p.56, 2-4.  Mr. Alston admitted, however, that his testimony at a prior grand jury proceeding had been truthful and that it appeared that at that grand jury proceeding he had testified that Mr. Malki had told him, and he had told the agents, that they could have anything.  T at p.56, 5-p.59, 18.  Mr. Alston further testified that he had signed the consent to search form.  T at p.59, 24-p.62, 6.

The testimony then ended and the Court stated that it credited Mr. Ross' testimony that Mr. Alston had told Mr. Ross that Mr. Malki gave the government agents permission to take anything they wanted, and that fact, in addition to Mr. Alston's written consent to search, could be reasonably construed by the agents as a consent to search the apartment.  T at 72, 1-12.

## II. Law.

The fourth amendment to the Constitution prohibits unreasonable searches and seizures of an individual's property.  The Supreme Court has interpreted that to mean that the warrantless search of an individual's home is unconstitutional, unless voluntary consent to the search has been given.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  Consent can be obtained either from the individual whose home is searched, or a third party who possesses common authority over the premises.  United States v. Matlock, 415 U.S. 164, 171 (1974).  The

Second Circuit has set a two prong test to determine if a third party has the legal ability to consent to a search. First, the third party has to have access to the area searched, and second, the third party has to have "either: (a) common authority over the area; or (b) a substantial interest in the area; or ©) permission to gain access." United States v. Davis, 967 F.2d 84, 87 (1992).

In Illinois v. Rodriguez, 497 U.S. 177 (1990), the Supreme Court held that the government had the burden of proving consent. In evaluating whether law enforcement officials had acted appropriately in determining whether an individual giving third party consent to a search had common authority to permit such a search, the Court held that a reasonableness test applied. If law enforcement officials acted reasonably in their belief that a third party was authorized to consent to a search, the search would not later be held to be unreasonable if the facts the officers relied on turned out to be wrong. Id. at 185-86. The Court further held, however, that the law enforcement officers' determination of consent "must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? If not, then the warrantless entry without further inquiry is unlawful unless authority actually exists." Id. at 188-89 (internal quotations and citations omitted.)

Courts have consistently applied this standard in determining whether law enforcement acted reasonably in their reliance that a third party had authority to consent to a search. In United States v. Brown, 961 F.2d 1039 (1992), the Second Circuit held that it was unreasonable for a police officer to believe that a landlady, who had permission to enter an apartment to turn off electrical appliances when a fuse blew, had permission to consent to a search of the tenant's apartment. The Court in Brown cited with favor two cases from other circuits, United States v. Whitfield, 939 F.2d 1071 (D.C. Cir. 1991) and United States v. Warner, 843 F.2d 401 (9th Cir. 1988). In Whitfield, the Court found that police officers were required to inquire further as to whether a mother had authority to consent to the search of a bedroom of an adult son living in the mother's home. Because the police questioning of the mother prior to the search had not disclosed sufficient information to support a reasonable belief that she had permission to consent to the search, the items seized as a result of the search had to be suppressed.   Id. at 247. In Warner, the Court found that a police officer did not reasonably rely on the third party consent of a landlord to search a garage, where the landlord only had permission to enter the premises to make certain repairs and mow the lawn. The Court found that the landlord did not have any right of access for most purposes, therefore could not consent to the search, and it was unreasonable for a police officer to rely on his consent. Id. at 403.

## III. Application of the law to Mr. Malki's case.

It is clear from the case law that Mr. Alston did not have the ability to independently consent to a third party search of Mr. Malki's apartment. Under the Davis test, Mr. Alston had no independent access to the apartment. He did not possess his own set of keys to the apartment, and only had keys to the apartment on the day of the search as a result of Mr. Malki telling the holder of the keys to provide them to Mr. Alston. Therefore the first prong of third party consent under Davis has not been met. With respect to the second prong, Mr. Alston

4

had no common authority over the area. While he paid Mr. Malki's rent, he paid it using money provided by Mr. Malki. There was no testimony that Mr. Alston had any interest in the apartment, much less a substantial interest. The only part of the <u>Davis</u> test that is met in this case is that Mr. Alston had permission to gain access to the apartment, but again, the facts of the case show that his permission to gain access was limited to providing entry to the agents at the request of Mr. Malki. There is no evidence that he had permission to gain access beyond Mr. Malki's direct instructions. The written consent to search signed by Mr. Alston on September 30, 2005, prior to the agents' search of Mr. Malki's apartment is therefore irrelevant. Mr. Alston had no independent authority to consent to a third party search of Mr. Malki's apartment.

The real issue, then, is whether the agents' reliance on Mr. Alston's claim, that Mr. Malki had told him to tell the agents that they could take anything from the apartment, was reasonable. Based on the evidence, the agents' reliance on Mr. Alston's claim was not objectively reasonable. First, the agents in Brooklyn never spoke directly to Mr. Malki about *any* search of his apartment. The agents in Brooklyn relied on the statement of an agent in Iraq that he had obtained written consent to search Mr. Malki's laptop computer and hard drive. The agents in Brooklyn understood that Mr. Malki's direct consent was limited to their searching two items located in his apartment, not that it permitted any search of his apartment. The agents' reliance on a statement from Mr. Alston concerning Mr. Malki's consent, when so vastly different from what the agents knew Mr. Malki to have consented to in the presence of their agent, was patently unreasonable.

Second, while the agents knew that Mr. Malki was friends with Mr. Alston, and the agents knew that Mr. Malki had left Mr. Alston in charge of paying his rent and his telephone bill, there is no testimony from Mr. Ross or Mr. Alston as to any other authority or permission to enter or dispose of property that Mr. Malki had given Mr. Alston over his apartment. Mr. Alston did not live in the apartment, was not related to Mr. Malki, and was not a landlord of the property. Given the duty to inquire further noted in <u>Whitfield</u>, where third party consent came from a mother living in the same home as her son; <u>Brown</u>, where third party consent came from a landlady who was living in the same apartment building as a tenant; and <u>Warner</u>, where third party consent came from a landlord had permission to enter to make repairs, additional inquiry was clearly needed in this case. Mr. Alston came to the agents with a claim that Mr. Malki had given permission to extraordinarily expand their actions in his apartment from simply taking his laptop computer and hard drive to searching his entire apartment and taking anything they liked. Faced with this extraordinary claim, and the incredible difference between this claim and the consent to search the government's own agent in Iraq had directly obtained from Mr. Malki, the agents in Brooklyn had a duty to inquire further.

This is especially true since there was no exigency to the search. Although Mr. Ross testified that he did not have direct access to Mr. Malki or to Agent Voettiner in Iraq, there was nothing preventing him from attempting to contact Agent Voettiner through others in an effort to reach Mr. Malki. Mr. Ross must have had some way to reach Agent Voettiner to ask him to interview Mr. Malki in the first place, and could have used those contacts to reach Agent Voettiner again. There was also nothing preventing Mr. Ross from trying to contact Titan, Mr.

Malki's employer, in an effort to reach Mr. Malki.

Without any need for exigency, Mr. Ross could have taken the lap top computer and the hard drive from Mr. Malki's apartment on September 30, and returned at a later date to further search the apartment, after confirming the expansion of the search with Mr. Malki. In fact, the only reason to search Mr. Malki's apartment on September 30 and not wait to confirm with him directly that he had consented to an expansion of the search, would be the agents' fear that Mr. Alston was not correct in his claim that Mr. Malki had given permission to expand the search, or that if the agents spoke directly with Mr. Malki he would deny them permission to expand their search. Both scenarios call the "reasonableness" of the agents' actions in conducting the search on September 30 into question.

For these reasons, we respectfully request that Mr. Malki's motion to suppress evidence seized from his apartment on September 30, 2005 be granted in full.

Respectfully submitted,

Mildred M. Whalen
Staff Attorney
(718) 330-1290

cc:    Assistant U.S. Attorney Jeffrey Knox, Esq.
       ECF
       Mr. Noureddine Malki, MDC