**WIGGIN AND DANA**

*Counsellors at Law*

Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, Connecticut
06508-1832
www.wiggin.com

James I. Glasser
203.498.4313
203.782.2889 fax
jglasser@wiggin.com

August 5, 2011

The Honorable Brian M. Cogan
United States District Judge
United States District Court
 Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:     *United States v. Malki*
          Nos. 05-CR-845-01 and 06-CR-216-01

Dear Judge Cogan:

        Undersigned counsel has received an electronic copy of the "revised" Presentence Investigation Report ("PSR") pertaining to the captioned matter.  I have reviewed the report with Mr. Malki and on behalf of Mr. Malki we respectfully submit the following objections to the revised PSR.  Sentencing in this matter is presently scheduled before Your Honor on September 15, 2011 at 11:00 a.m.

**OBJECTIONS:**

Paragraph 19

        Paragraph 19 indicates that agents interviewing Mr. Malki at his home in Brooklyn, New York advised him "that they were aware he was using a false identity; thus, he was forced to come forth with the truth."  In fact, according to the FBI-302, agents asked if M. Nour was familiar with "Noureddine Malik" (so in original).  At that time, Mr. Malki told the agents that Nourredine Malki was his name and admitted his true identity, and that many of the facts in his asylum application were fabrications.

Paragraph 20

        Paragraph 20 should reflect that Mr. Malki was first interviewed by law enforcement authorities in Iraq where he provided consent to search his home, computer and telephone.  Mr. Malki then returned to the United States and first traveled to the offices of Titan Industries in Georgia and then to visit friends in Florida.  When he learned that law enforcement authorities wanted to speak with him further, he made arrangements to return to New York. When he first called law enforcement authorities to tell them that he was back in New York, he was told that they were tied up and would get back to him in a few days.  He subsequently made an

*New Haven   Stamford   New York   Hartford   Philadelphia*

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 2

appointment to meet with authorities at his Brooklyn, New York apartment.   There, he served
the agents coffee and submitted to two days of interviews and interrogation.  Mr. Malki
cooperated with authorities by providing written consents to search his e-mail accounts and by
making numerous admissions. At the conclusion of the second day, October 12, 2005 (not the
13th as indicated), at approximately 4:15 in the afternoon, Mr. Malki was arrested.  Paragraph
20 should reflect that following his arrest, Mr. Malki voluntarily agreed to participate in two
separate proffer sessions with the law enforcement authorities; one on October 19, 2005 and a
second on November 3, 2005.

Paragraph 21

Paragraph 21 states that forensic analysis of Mr. Malki's "computers" recovered from his
Brooklyn apartment reveal that shortly after September 11, 2001, the defendant began visiting
pro-Al-Qaeda websites, and downloading images praising Osama Bin Laden, al Qaeda, *etc*.

The defendant objects to the incendiary allegations of this paragraph.  First, Mr. Malki
had a single computer in his apartment, not computers.  Second, Mr. Malki purchased his
computer in the Spring of 2004, well after September 11, 2001.  Upon information and belief,
the government is in possession of receipts reflecting this purchase.  Third, undersigned counsel
was advised by counsel for the government  it is not in possession of a forensic analysis report
of Mr. Malki's computer and hard drive. *See* Letter from Daniel Silver to James Glasser dated
June 23, 2011. A careful analysis of Mr. Malki's computer was conducted by the defense in this
matter and no evidence that Mr. Malki "visit Al-Qaeda" websites or download information from
them was discovered.  Rather, Mr. Malki visited a variety of websites including numerous
mainstream web sites like CNN, BBC, Associated Press, and others like them and downloaded a
wide range of material relating to world events in the Middle East and that he used as
foundational materials for his cultural awareness courses that he was asked to present as part of
his duties for the military while serving in Iraq. Mr. Malki was repeatedly recognized for the
cultural awareness course he taught.  For example, Captain Daniel Lee stated:

> "His commitment to supporting this unit was unwavering.  He
> provided great insight into the local culture and helped the
> soldiers gain a better understanding of the local population's
> cultures and traditions.  His passion and skills were
> instrumental in building the unit's ties with the local
> community."

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 3

And, Lieutenant Colonel Anderson remarked that Malki "has spearheaded our humanitarian assistance efforts with several local villages; and - most remarkably - he has single handedly developed an Iraqi cultural awareness training program for our soldiers."

The images Mr. Malki saved included political cartoons, news broadcasts, and television broadcasts concerning issues relevant to the Middle East. The fact that the information Mr. Malki viewed or saved may have been both supportive and critical of the government or the elected officials of the United States is hardly evidence that he has pro Al-Qaeda "attitudes." Finally, our own review of the mirrored hard drives provided to us discloses that the computer and hard drive contain a wide variety of materials including political commentary, political cartoons and decidedly "pro-America materials."

Paragraphs 22 and 23

These paragraphs posit that Mr. Malki obtained his position with Titan Industries and subsequent security clearances by fraud. While true, Mr. Malki lived and worked under his assumed name for fourteen years before making application to Titan. The PSR notes that Mr. Malki lied about his criminal history, claiming that he had never been charged with a felony offense, had no charges pending, and had not been arrested within the past seven years. Mr. Malki was not aware that a warrant was outstanding on these charges. Indeed, in this regard it is instructive to note that the Massachusetts matter was not revealed in the Department of Defense background investigation conducted to accord Mr. Malki secret and top secret clearance and indeed was not revealed in the initial PSR issued by the Probation Office in connection with this matter. Given that the matter did not come up during his background check, it is hardly surprising Mr. Malki was not aware or did not believe there was a charge pending against him.

Paragraphs 24 and 25

In these paragraphs the Probation Department claims that Mr. Malki was given "extensive" training as to the handling of classified documents. Mr. Malki was given a lecture at the time his security clearances were granted on the use and protection of classified information. This lecture was given to Mr. Malki before his initial deployment to Iraq in 2003 and prior to his second deployment to Iraq in 2004. However, Mr. Malki did not realize that he had classified information in his possession until he returned to the United States, and the information provided to him never addressed what to do if he found that he had inadvertent possession of classified materials. As a result, Mr.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 4

Malki believed that the only person he could talk to was his former boss, Major Box. Indeed, the Army Regulation governing the Army's Information Security Program advises: "Any one finding classified material out of proper control, will take custody of and safeguard the material, if possible, and immediately notify the appropriate security authorities. In all cases, the individual's immediate supervisor is to be notified." AR 380-5, ¶ 10-2, "Reaction to discovery of incident." Mr. Malki was not informed of who the "appropriate security authorities" were other than Major Box. Gov't Ex. 1 at 11.[1] There is no information in the papers Mr. Malki signed regarding "appropriate security authorities," and Mr. Malki, whose only experience with the Army was while deployed in Iraq, did not know who to contact in the United States. When he realized he had the information, he attempted to contact Major Box – coincidentally, completely consistent with the Army's regulation. Mr. Malki has acknowledged his failure in this regard. He should have acted differently than he did. His failures form the basis of his pleas of guilty.

Paragraph 26

This paragraph is illustrative of the dangers and great potential for injustice to be done in this case. In Paragraph 26 of the PSR, the Probation Department reports that Mr. Malki made anti-U.S. admissions prior to his deployment.

This claim, and others like it, are pernicious because of the false impressions they create and the likelihood of precipitating an unjust result at sentencing. Undersigned counsel interviewed Mr. Alston about this alleged statement. Mr. Alston reported that he never said what was reported and would not have made such a statement because, to his knowledge, Mr. Malki holds no such views. (Mr. Alston has provided an affidavit so stating.) Mr. Alston was never interviewed by the Probation Department. Therefore, this information necessarily originated with law enforcement authorities. AUSA Silver has so confirmed by letter dated June 23, 2011.

The government has provided counsel with an FBI-302 of an interview of Mr. Alston where, among other things, Alston was asked what he thought of Mr. Malki's fitness to serve as an interpreter in Iraq, Mr. Alston is reported to have responded:

> ". . . even though Nour is sympathetic to the cause and
> knows that innocent people are being killed over there, but

---

[1] Gov't Ex. ___ refers to the Exhibit number annexed to the government's sentencing memorandum.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 5

> there are good and bad people everywhere. Additionally,
> Alston stated that Nour told him that he would not
> participate in any raids of Iraqi villages and would only
> translate during interviews. Overall Alston considers Nour
> to be of good character and suitable to his position."

This statement hardly constitutes "Anti-U.S. admissions and certainly does not indicate that Mr. Malki is "supportive of Muslim uprisings." Nor does it support the conclusion that Mr. Malki "confided to Alston that he was in fact sympathetic to the efforts of anti-U.S. coalition forces in Iraq" as quoted in Paragraph 26 of the PSR. Mr. Alston has since confirmed by affidavit that he conveyed to law enforcement authorities that Mr. Malki was sympathetic to the U.S. cause in Iraq.[2] This statement has been transmuted to an allegation most damning.

Letters provided in support of Mr. Malki that are attached to the Resentencing Memorandum lend support and buttress the conclusion that the PSR and the government are mistaken concerning their spin on Mr. Alston's alleged statement to law enforcement authorities. For example, Mr. Dwedar recounts this conversation with Mr. Malki when he took the position as an interpreter:

> He joined the army as a linguist in Iraq to translate and make
> our army and Iraqi citizens understand each other without any
> problem. His love for his country made him join the army in a
> dangerous mission to liberate the people of Iraq. Even though I
> explained to him the high risk of the mission, he insisted in
> going. He said "If I didn't help my country now, so when?"

---

[2] FBI policy requires agents to preserve hand written notes of interviews. Undersigned counsel requested that the government produce the hand written notes, counsel was informed that the notes could not be located. *See* Letter from Daniel Silver to James Glasser dated August 3, 2011.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 6

Paragraphs 27 through 32

In Paragraphs 27 through 32 of the PSR, the Probation Department claims that Mr. Malki "stole" classified army documents. Mr. Malki does not dispute that he wrongfully retained the charged documents but does dispute that he stole them. The paper and digital documents he had in his possession were improperly retained unwittingly.

As the record demonstrates, Mr. Malki was in no position to steal classified documents from the U.S. Army. Indeed both Major Box and Sergeant Braun, of the 82nd Airborne, Mr. Malki's supervisors, have explained how classified information was maintained in the "G2" office.[3] First, the office was manned 24 hours a day, seven days a week, and Mr. Malki was never left alone in that office. Second, any work Mr. Malki did in the G2 office on computer was supervised. The computer had secret and non-secret removable hard drives. The secret hard drive was also password protected and Mr. Malki did not have a password. *See* Transcript dated 5/19/08 p. 7-8. When Mr. Malki needed to work on the computer, the secret hard drive was removed, the unclassified hard drive was put in, and Mr. Malki was supervised the entire time he was working. Major Box and Sergeant Braun's recounting of the security measures in place are entirely consistent with the testimony of Major Lofrgren that was offered at the original sentencing hearing in this matter.

Mr. Malki has no definite information as to how the documents came into his possession, but he did not and could not steal this information. He believes that he may have received the paper documents or picked them up unwittingly. As will be demonstrated in the Defendant's Supplemental Sentencing Memorandum and Response to the Government's Resentencing Memorandum, such occurrences are not uncommon. This is especially true of document #3, the "frago" report, which lists, as an attachment, a Hajj training packet for cultural sensitivity training for U.S. soldiers. This is the very type of cultural sensitivity training that was conducted by Mr. Malki, and it is reasonable to believe that Mr. Malki may have been given or shown the document with its attachments for use in preparation of his own cultural sensitivity presentations. Since the last sentencing in this matter, the government has disclosed that Major Box earlier informed the government that Mr. Malki also may have been given access to the "synchronization report" as part of his civil affairs duties. Thus, ready explanations exist for certain of the documents, other than theft.

Mr. Malki further believes that the "Mission Analysis" was accidentally downloaded to him along with other documents. When Mr. Malki was working at the Al Taqqadam air base he did not have his own computer and received information for translations and for his cultural awareness

---

[3] "G2" is a military designation for the military intelligence office of a unit.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 7

training via electronic downloads. He kept these downloads on a thumb stick and then transferred them to CDs. As demonstrated in the original sentencing hearing, this particular document was included in a sequential series of electronic images on the CD that included pictures of other members of Mr. Malki's team. The government has acknowledged that all the photos, including the Mission Analysis, was taken with the same camera. Certain of the pictures include Mr. Malki in the shots. It stands to reason that the photos were not taken by Mr. Malki, but were downloaded to him.

The Probation office also alleges that Mr. Malki attempted to read reports the Army unit prepared regarding the identities of informants. This appears to be a reference to the statement of Sergeant Mauricio referenced in the first sentencing hearing by the government in support of the proposition that Mr. Malki improperly requested access to the Tactical Human Intelligence Team ("THT") reports. Gov't Ex. 1, at 41. In fact Mr. Malki was the interpreter whose duty it was to translate for the THT and to accompany the THT on source interviews. Gov't Ex. 6, at 14. Thus, Mr. Malki was already familiar with the content of the source interviews. Because Mr. Malki's translations provided a basis for the THT source reporting, it was entirely reasonable and appropriate that he would want to verify that THT members writing the reports accurately captured his translations. *See* Gov't Ex. 1, at 42. Indeed, as Exhibits 13 – 23 of the defendant's first filed sentencing memorandum demonstrate, Mr. Malki was extremely conscientious about his work. As Major Whitman wrote in his letter of recommendation, Mr. Malki "established the standard for all other linguists" assigned to the unit. Defense Ex. 17.

Paragraph 32 in essence claims that improper handling of these materials could have impacted the U.S. mission and put U.S. soldiers at risk. While that is no doubt true anytime defense documents are mishandled, the record here demonstrates that Mr. Malki was completely dedicated to the U.S. mission in Iraq and contributed to its success. As Commanding Captain McGregor wrote: Mr. Malki was "critical in the unbridled success of SIGINT and exploitation of the combined SIGINT cell. His contributions have undoubtedly saved the lives of countless soldiers and civilians while ensuring that the insurgency and terrorist threat was drastically reduced." Letter of Commanding Captain Robert J. McGregor, Military Intelligence G. Ex. 14.

Finally, the PSR states that disclosure of the Fire Report around the time the defendant stole it "would have significantly aided the coalition forces..." There is absolutely no evidence that Mr. Malki stole the Fire Report and absolutely no indication of when this report came into Mr. Malki's possession. It appears the useful life of the report was forty-eight hours. It is just as likely that it came into Mr. Malki's possession significantly after its useful life. There is certainly no evidence that has been offered that Mr. Malki disclosed the report to the detriment

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 8

of the United States.  If there was, the government certainly would have charged him with a more serious violation of 18 U.S.C. § 973.

On this point it is worth observing that if Mr. Malki truly had some malicious intent with regard to these documents, he certainly would not have kept them well after their useful life.  As mentioned, the Fire Report had a useful life of forty-eight hours by the terms of the report itself.  The Hajj document similarly was relevant to a several week period in January and February 2004 only.

Paragraphs 33 to 37

In Paragraphs 33 through 37 of the PSR, the Probation Department asserts that Mr. Malki had motives for stealing classified documents.  Mr. Malki did not steal the subject documents and had no motive to do so.

The PSR again claims that Mr. Malki supports al Qaeda and the September 11 attacks and is opposed to the United States presence in Iraq.  There is no support provided for this conclusion however.  To the extent this statement rests on the report of interview of Mr. Alston, it is nothing less than outrageous.  Mr. Malki does not and never has support Al-Qaeda and its attacks on the United States or anyone else.  In support, the PSR references materials found on Mr. Malki's computer hard drive.  The paragraph fails to mention that Mr. Malki was asked to provide cultural awareness training to soldiers in Iraq.  He was repeatedly lauded for the training he provided.  Many of the materials on his computer helped him to prepare his cultural training courses.  Moreover, as detailed in Mr. Malki's supplemental sentencing memorandum, a detailed analysis of the computer and hard drive discloses that there were materials on all sides of the debate concerning the Iraq war and conflicts in the Middle East.   The materials included award winning cartoons and Pulitzer prize winning photographs and came from public sources such as CNN, the BBC, British newspaper tabloid, the Associated Press and other commercial and public sources.  The information he had on his computer was not indicative of support for any wrongful activity and does not provide a motive for Mr. Malki to steal classified documents.  Indeed, noticeably missing from the PSR is the fact that Mr. Malki had materials supportive of the United States on his computer.

Second, Mr. Malki did not develop unauthorized relationships with individuals in Iraq and did not knowingly have contact with anyone involved in anti-coalition activities.  Mr. Malki worked as an interpreter with the local sheiks on trucking and other contracts *for* the U.S. Army.  As but one

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 9

illustrative example, of support for the proposition that Mr. Malki was authorized to have contact with locals is Major John Box's Titan Customer Survey, where he described Mr. Malki's duties to include:

> "Local national screening, responsible for translating documents exploited
> during combat operations, interviewing sheiks and imams, VIP interpretation,
> Al Anbar Trucking linguist requirements and Adopt A School visits, teaches,
> coaches, and mentors soldiers in cultural awareness training."

The PSR then states that Mr. Malki developed close relationships with local Sunni sheiks who had trucking contracts with the U.S. Army who also involved in anti-coalition activities. PSR, ¶ 34. But, as demonstrated above, these are the very duties that were part and parcel of his legitimate employment that are not being recast as nefarious and sinister. Mr. Malki had no knowledge and does not have any knowledge that any of these sheiks were involved in any anti-coalition activities. The blanket statement that "the Sunni sheiks in this region . . . were known to have supported al Qaeda in Iraq and other anti-coalition forces during this period" does not mean that Mr. Malki or the army authorities he was working with had knowledge of this, or even that the particular sheiks they were working with in fact supported Al Qaeda.

With respect to the claim that Mr. Malki was seen speaking to sheiks, Major Craig Normand's evaluation and description of Mr. Malki's duties is instructive: "Nour travels weekly with commanders to assess local reactions, visit sponsored schools, and meet with local businessmen who seek contracts with the 82[nd] Airborne Division . . . . His contributions make a daily positive impact on the 82d Airborne Division operations in Iraq. Colonel Vincent Demaggio, when providing a letter of recommendation for Mr. Malki noted that in addition to "devoting countless personal hours to conduct cultural awareness classes for soldiers two night a week . . ." had duties including "interpreting for local nationals, translating documents and assisting contracting officers when dealing with local Sheiks and Imams, assisting maneuver commanders with school or village repair/restoration projects in local villages. These duties require him to interact with <u>hundreds of separate episodes daily</u>. He accomplishes his mission with cultural sensitivity, dignity and respect for all." (G. Ex 15) (emphasis added.)

Mr. Malki was asked by the U.S. Government to interact with many people, -- hundreds. It is certain that Mr. Malki did not know all there is to know about each of the sheiks, imams and others. It is certain that he was asked to interact with them on behalf of the U.S. Army. Those interactions are now being turned against him.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 10

It is difficult to defend against legitimate employment activities Mr. Malki was asked to engage in, was praised for engaging in, and that are now recast as "unauthorized relationships."

Mr. Malki did not speak to sheiks without authorization, and the fact that the sheiks may have preferred to use Mr. Malki as their sole means of communication with the army is likely because Mr. Malki was the best interpreter working on the Al Taqqadam base. "Nour has been my most reliable linguist." - -Major Box . "I have not worked with a finer and more professional linguist than Mr. Nour." - - Major Whitmire.

With respect to the specific claims of wrongdoing as providing a motive for stealing classified documents, none rationally provides a motive for theft. Mr. Malki's "use" of the automobile was to get a ride from one end of a base to the other rather than walk in the rain. Mr. Malki was reprimanded for riding in the car, but when he explained the problem, the Army provided Mr. Malki with a scooter so that he could more easily get around the base. Mr. Malki was given a cash gift around Christmas 2003 and after the sheiks and the army had been working together, not before. Other members of the military were also given these gifts, which is customary in that part of the world. Reports recently provided to defense counsel disclose that several of Mr. Malki's superiors on the base were similarly given gifts of cash and jewelry by the shieks. The gifts were not in any way secret, and many members of the military knew about them. Mr. Malki candidly acknowledges receiving this gift of cash during his pre-arrest interview with law enforcement authorities. He also provided the names of other military personnel who similarly received cash gifts and watches. It appears that the information Mr. Malki provided to authorities concerning the acceptance of cash was subsequently used, at least in part, to prosecute Lieutenant Colonel David Pfluger. No credit, however, has been given to Mr. Malki for providing this information, not even a recommendation in favor of credit for acceptance of responsibility.

With respect to the trip to Jordan, Mr. Malki traveled to Jordan to discuss the feasibility of purchasing used refrigerated tracks in the United States and shipping them to Iraq (the trucking company had offices in Iraq and Jordan) in anticipation of starting a business. At the time of the trip, Mr. Malki was in the United States recuperating from a shoulder injury sustained in Iraq. He did not believe he was under contract with Titan at the time of the trip because of his extended hiatus and the conditions of his employment specifying a break in employment. He was not certain if he would return to employment with Titan. Mr. Malki did not believe, therefore, that he had to report the trip to Titan or anyone else.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 11

The report of a violation of protocol with "Kifah" stems from an incident where Mr. Malki observed soldiers purchasing liquor and bringing it onto base in violation of rules. The soldiers were aware that Mr. Malki saw them obtained the liquor and were afraid Mr. Malki would report them, and so they claimed that Mr. Malki was having unauthorized contact with individuals at the base gate. In fact, Mr. Malki wrote a report about this incident to his superior and specified that he had frequent contact with Kifah, as well as many other locals as part of his daily responsibilities on the base.

Mr. Malki interpreted and interacted with Kifah for the U.S. Army. About a year after Mr. Malki left the Al Taqqadam base, Kifah contacted him. Kifah first inquired after Mr. Malki's health because he learned Mr. Malki had returned to the United States with an injury. Kifah then explained that he had fled to Syria and then Lebanon because members of his family had been kidnapped and killed. Kifah asked if Mr. Malki could put him in touch with members of the army unit Kifah had worked with at Al Taqqadam. Kifah wanted to appeal to members of that army unit directly to help him get his family out of Iraq. Mr. Malki told Kifah that he was no longer in contact with those men. Mr. Malki also received calls from members of Kifah's family, trying to get his help to get them out of Iraq. It is hardly surprising that Mr. Malki, who was the intermediary between the army and the local population, would in turn be sought out by the local population to be their intermediary with the army.

Mr. Malki did not knowingly have contact with anyone with ties to anti-coalition forces. The telephone numbers from Iraq were of individuals he met while working with the army, the telephone numbers in Jordan were related to his efforts to get into the trucking business, and the numbers in Syria were for Kifah and his family. The government provided predecessor counsel with "evidence" of these contacts with "foreign phone numbers tied to anti-coalition forces" in the form of a phone tree that shows at least two degrees of separation between Mr. Malki and numbers which *may* be connected to insurgents. This is akin to claiming that because the President of Yale and a gang member in New Haven both have the number to Pepe's Pizza in their cell phones that the two are connected. The government offered no evidence that Malki contacted these persons of interest or that the people he did call contacted them on his behalf. Malki interacted with Army intelligence sources. That these people may have been in contact with "insurgent forces" is not surprising given their value as sources. Malki was not only authorized but *required* to interact with these people as part of his duties in Iraq.

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 12

Paragraph 38

Paragraph 38 of the PSR claims that Mr. Malki made a false exculpatory statement concerning his possession of classified information. This is not so. Mr. Malki did not knowingly take classified information from Iraq to his home in Brooklyn. Once back in Brooklyn, however, Mr. Malki found that he had unwittingly taken an one electronic document and learned of the three paper documents only after his apartment was searched by law enforcement authorities. Mr. Malki never said that anyone authorized him to take the information, he simply tried to explain how he thought the material had come into his possession.

Paragraphs 39, 40, 53 and 65

In Paragraphs 39 and 40 of the PSR, the Probation Department claims that Mr. Malki obstructed justice by deleting e-mails and text messages before an interview with the FBI in Iraq, that Mr. Malki falsely claimed in a letter to the Court that he had no criminal record and had never been in trouble with the law, and that Mr. Malki made false statements during his plea allocution because Mr. Malki photographed a classified battle map while stationed in Najaf and therefore could not have obtained the other classified information by accident. Mr. Malki did delete his e-mails and cell phone text messages but he told law enforcement authorities that he had done so when he voluntarily submitted to a consensual interview. He then signed consents to search his e-mail records, presumably so that e-mail could be recovered from service providers. As noted above, Mr. Malki did not knowingly lie to the Court about having a criminal record. Mr. Malki did not have a criminal record and did not believe that a warrant had been issued.

During his plea allocution, Mr. Malki did not say that he had been authorized to have the documents, he again was trying to explain that he believes he received the "Mission Analysis" document as part of an authorized download. None of these statements are evidence of obstructive behavior. Finally, Mr. Malki did not photograph or steal a classified U.S. Army battle map. It was common for soldiers to download copies of photographs they had taken and give them to Mr. Malki and others who appeared in them. The battle map photographs are part of a series of photographs provided to Mr., Malki of time he and the soldiers had spent in the region. *See* Gov't Ex. 6, at 32 – 36. Rather than being evidence of further criminal activity on the part of Mr. Malki, these photographs are further evidence of how Mr. Malki could unknowingly come into possession of classified information. As mentioned above, Mr. Malki is depicted in several of the pictures in the

WIGGIN AND DANA

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 13

sequentially numbered series of photographs, further supporting his claim, that these photos, along with the picture of the map, were passed to him and he received it unwittingly.

The defense understands, that the "mandate rule" generally prohibits reconsidering this adjustment on resentencing. However, should the court determine to impose a non-guidelines sentence, we respectfully request that the court revisit this enhancement.

Paragraphs 41 - 47

The defense objects to the denial of credit for acceptance of responsibility. We recognized that Judge Korman denied this credit and his determination was affirmed on appeal. However, this is an extraordinary case where Mr. Malki spoke with investigatory agents in Iraq and provided consent to search his computer and telephone. He thereafter provided consents to search e-mail accounts. Then he voluntarily returned to the United States and affirmatively sought out FBI agents who had attempted to contact him. He thereafter submitted to two days of interviews and interrogation where he acknowledged his prior false statements and obtaining his citizenship by fraud. He also acknowledged his improper retention of classified documents. We respectfully ask that his cooperation in his own prosecution and his pleas of guilty be taken into consideration in fashioning an appropriate sentence. Mr. Malki then pleaded guilty to each and every count of two separate indictments. Mr. Malki thereafter participated in two separate proffer sessions with the government and it appears that information he provided contributed to the successful prosecution of another. Yet, incredibly, he has been denied credit for acceptance of responsibility.

Again, the defense recognizes the import of the "mandate rule." However, should the court consider imposing a non-guideline sentence, we ask the Court to consider Mr. Malki's please of guilty to two separate indictments and his cooperation in his own prosecution.

Paragraph 64

The PSR recommends a two-level adjustment for Mr. Malki's role in the offense pursuant to U.S.S.G. § 3B1.3 for abuse of position of trust. The defendant objects to this adjustment. This enhancement was considered and rejected by Judge Korman during the first sentencing proceeding. The government did not challenge the finding on appeal, and has waived the right to relitigate the issue. *See United States v. Quiroz*, 22 F.3d 489, 490 (2d. Cir. 1994). As the Second Circuit recently held, the "mandate rule" ordinarily forecloses relitigation of all issues previously waived or decided by the appellate court. *United States v. Quintieri, 306 F. 3d 1217,*

WIGGIN AND DANA

*Counsellors at Law*


The Honorable Brian M. Cogan
August 5, 2011
Page 14


*1225 (2d Cir. 2002).* The PSR and the Government's recommendation concerning this adjustment is discussed in Mr. Malki's supplemental resentencing memorandum.

Paragraphs 84 through 87

Paragraphs 84 through 87 of the PSR, the Probation Department claim that Mr. Malki committed other criminal conduct by possessing sketches and videos of the entrance to Al Taqqadam airbase, that he photographed and thereby stole a classified battle map, and that he tried to gain access to sensitive information. The defense objects to these factual assertions.

First, the alleged sketches, such as they are, have been made available to the Court as an Exhibit to Mr. Malki's sentencing memorandum so the Court can see for itself what the government is claiming as sensitive information. Second, more than four hundred Iraqi civilian came into the Al Taqqadam base through its entrance to work on a daily basis. Many individuals were aware of the contours of the entrance to the base; it was no secret. Third, many images of the base and its entrance are available on websites such as Google Earth and on file and photo sharing websites. This is yet another example of the government attempting to convert completely innocent and authorized conduct into something nefarious and sinister. As noted above, Mr. Malki did not photograph this classified map, it was provided to him as part of a download of other photographs from Mr. Malki's time in Najaf. Finally, as established in Mr. Malki's supplemental sentencing memorandum, he could not have taken the videos of the entrance to Al Taqqadam airbase. According to the metadata of when the video was taken, Mr. Malki was stationed at another base, more than one hundred miles away!

Paragraphs 139 to 142

The suggested mitigating and aggravating factors suggested by the Probation Office are addressed in Mr. Malki's sentencing memoranda.

Paragraph 100

The reference in Paragraph 100 to Paragraph 107 should be to Paragraph 108.

**WIGGIN AND DANA**

*Counsellors at Law*

The Honorable Brian M. Cogan
August 5, 2011
Page 15

We urge the Court to take into account Mr. Malki's offense conduct, his cooperation in his own prosecution and pleas of guilty to two separate indictments, the testimonials to Mr. Malki's contribution to the war in Iraq, the punishment he has already endured under harsh conditions of confinement and the gross disparity of the sentence imposed on Mr. Malki when compared to the sentences imposed on others who have committed the same and much more serious offenses.

We respectfully submit the Court should impose a sentence of between 63 to 78 months. Such a sentence is sufficient but not greater than necessary to accomplish the statutory purposes of sentencing.

Respectfully submitted,

James I. Glasser

JIG:

21896\15\2536914.3

cc:    Mr. Dan Silver, Esq.

Ms. Michelle Espinoza
United States Probation Officer
United States Probation Office
75 Clinton Street
Brooklyn, NY 11201

Mr. Noureddine Malki